IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| TEMPUR SEALY INTERNATIONAL, INC. *et al.* § § § *Movants,* § § § v. § CHRISTOPHER J. CURRA § § § *Respondent.* § | | Civil Action No: 3:-25-cv-1718 |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TEMPUR SEALY INTERNATIONAL, INC.,TEMPUR-PEDIC MANAGEMENT, INC., TEMPUR-PEDIC NORTH AMERICA, LLC, TEMPUR WORLD, LLC, DAN-FOAM APS, and SEALY TECHNOLOGY LLC, *Plaintiffs,* v. MIKEY MATTRESS INC. d/b/a MATTRESS FOR LESS and d/b/a MIKEY MATTRESS, and MICHAEL AZZARITI, Individually *Defendants.* | § § § § § § § § § § § § § § § § § | Civil Action No: 2:24-cv-03312-AYS |

### MOTION TO ENFORCE SUBPOENA

NOW COME Tempur Sealy International Inc., Tempur-Pedic Management, Inc., Tempur-Pedic North America, LLC, Tempur World, LLC, Dan Foam ApS, and Sealy Technology LLC (collectively, "Tempur Sealy") which, pursuant to FED. R. CIV. P. 45, move this Court to compel

1

the production of information and documents requested via subpoena from non-party Christopher Curra ("Curra"), who has not properly complied with Tempur Sealy's subpoena. In support thereof, Tempur Sealy states as follows:

## INTRODUCTION

1.  On May 3, 2024, Tempur Sealy brought causes of action against Mikey Mattress Inc. d/b/a Mattress for Less and d/b/a Mikey Mattress, and Michael Azzariti ("Defendants") for deceptive trade practices and various violations of the Lanham act, including: trademark infringement, trademark counterfeiting, unfair competition, false advertising, and trademark dilution in the United States District Court for the Eastern District of New York.[1] Among other things, Tempur Sealy asserted causes of action related to Defendants' improper use of Tempur Sealy's marks; Defendants' false representations that their products are covered by a Tempur Sealy warranty; Defendants' misrepresentations suggesting any affiliation between Defendants and Tempur Sealy and/or its products; and Defendants' attempts to pass-off used and/or counterfeit mattresses as new and/or authentic. Christopher Curra admittedly supplied mattresses directly and/or indirectly to Defendants. Accordingly, Tempur Sealy served Curra with a Subpoena on February 4, 2025 requesting certain information and documents relevant to its causes of action. Although Curra produced some limited responsive documents, it is clear that he is improperly withholding additional information, communications, and documents related to his transactions with Defendants and others pertaining to the mattresses involved in such transactions. As such, Tempur Sealy seeks to compel the responsive information and documents it requested from Curra which are appropriate in scope, highly relevant to its causes of action against Defendants, and are not privileged.

---

[1] In the New York action, Tempur is represented by Brian D. O'Reilly and Alexandria Alinea of O'Reilly IP PLLC.

## BACKGROUND

2.  On or about February 4, 2025, Tempur Sealy served a subpoena to Curra commanding him to produce "documents, electronically stored information, or objects, and to permit inspection, copying, or sampling of . . . [d]ocuments related to the purchase and sale of mattresses bearing marks owned by Tempur Sealy between 1/1/2021 and 10/1/2022. Marks include but are not limited to TEMPUR-ADAPT, TEMPUR-PROBREEZE, TEMPUR-PROADAPT, TEMPUR-LUXEADAPT, TEMPUR-LUXEBREEZE, TEMPUR-FLEX, TEMPUR-CLOUD" ("Production Request") *See* February 4, 2025 Subpoena, attached hereto as Exhibit "A". Service of the subpoena was accepted by Curra's counsel who put forth objections and a response and also presented Curra for his deposition. *See infra*. To date, Curra has only produced four (4) invoices sent to Mikey Mattress Inc. ("Mikey Mattress") and a "Supplier List" consisting of a list of five (5) mattress suppliers that Curra purportedly created from memory. *See* Curra's Production CC0001-CC0005, attached hereto as Exhibit "B." On or about February 14, 2025, Tempur Sealy took the deposition of Curra. *See infra.* In that vein, upon reviewing the documents produced and based upon the testimony of Christopher Curra, it is clear that additional responsive and relevant records are being withheld and/or that a proper search for materials has not occurred.

## LEGAL STANDARD

3.  Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that: "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case[.]" "Subpoenas issued under Rule 45 are subject to the relevance requirement of Rule 26(b)(1)." *Am. Precision Indus., Inc. v. Fed. Ins. Co.*, No. 14-CV-1050-RJA, 2018 WL 3422060, at *2 (W.D.N.Y. July 16, 2018) (quoting *In re Refco Sec. Litig.*, 759 F. Supp. 2d 342, 345 (S.D.N.Y. 2011)). "For good cause, the court may order discovery of any

matter relevant to the subject matter involved in the action." FED. R. CIV. P. 26(b)(1). Indeed, "[t]he only restriction in this discovery is that the producing party be protected against undue burden and expense and/or invasion of privileged matter." *Playboy Enter., Inc. v. Welles*, 60 F. Supp. 2d 1050, 1053 (S.D. Cal. 1999); *see also* FED R. CIV. P. 45(d) (setting forth grounds for seeking to quash a subpoena).

4.     "A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection" to the materials sought. FED. R. CIV. P. 45(d)(2)(B). However, in *Armentrout* the court outlined a non-party's obligations when objecting to a Rule 45 subpoena:

> a non-party is subject to the requirements that an objection to a document request must, for each item or category, <u>state with specificity the grounds for objecting to the request</u>, including the reasons, and <u>must state whether any responsive materials are being withheld</u> on the basis of that objection; that an objection to part of a request must specify the part and permit inspection of the rest; that <u>"general or so-called boilerplate or unsupported objections are improper under Rule 45(d)(2)(B)"</u>; and that . . . what is required to make proper objections and how to properly respond to discovery requests apply equally to non-parties subject to a Rule 45 subpoena.

*See Orix USA Corp. v. Armentrout*, No. 3:16-MC-63-N-BN, 2016 WL 3926507, at *2 (N.D. Tex. July 21, 2016) [emphasis added]. In other words, a respondent to a subpoena cannot evade proper discovery requests through the use of inapplicable, non-specific, and/or boilerplate objections. *See id.*

<u>ARGUMENT</u>

*<u>Curra's Objections Should Be Overruled</u>*:

5.     Curra has asserted various boilerplate, inapplicable, and otherwise unmeritorious objections in response to Tempur Sealy's limited subpoena that merely included one request for production seeking documents over a time period of less than two (2) years pertaining to the purchase and sale of products bearing Tempur Sealy's marks. *See* Ex. A; Christopher Curra's Objections to Tempur Sealy's Subpoena, attached hereto as Exhibit "C."

4

6. Curra objected on the basis that the terms/phrases "Tempur Sealy," "mattresses bearing marks owned by Tempur Sealy," "[m]arks include but are not limited to," and "the purchase or sale of mattresses" are somehow vague or ambiguous. *See* Ex. C. Undefined terms are subject to their ordinary meaning,[2] and there should be no confusion with respect to the terms used in the production request, nonetheless, Tempur Sealy has clarified that the Production Request applies to all Tempur Sealy entities named in the live petition, the Tempur Sealy Marks listed in the live petition and/or any of Tempur Sealy's products that may have been included in purchases and/or sales by Curra during the requested time period. Furthermore, as Curra in the business of buying and selling mattresses in significant volumes for tens of thousands of dollars per transaction the suggestion that he is not familiar with Tempur Sealy and its products is specious and belied by Curra's deposition testimony and document production, as discussed *infra.*

7. Additionally, Tempur Sealy's document request also specifically includes any and all Tempur Sealy models listed in the purchase orders/invoices which Curra previously produced or other documents in Curra's custody, possession, or control in response to Tempur Sealy's Subpoena which have not yet been produced. *See* Ex. A. Moreover, Curra's counsel previously represented that he did not buy any of the products described from the Defendants but only sold products to them. Thus, the scope of responsive documents that pertain to the interactions with Mikey Mattress is already limited in that regard and is not unduly burdensome.[3]

---

[2] *See Mahalingam v. Wells Fargo Bank, N.A.,* No. 3:22-CV-1076-L, 2023 WL 3575645, at *4 (N.D. Tex. May 19, 2023)(a party objecting to discovery should exercise reason and common sense by attributing ordinary definitions to terms and phrases and should seek clarification from the requesting party prior to objecting on such grounds).

[3] Furthermore, Curra's response to the subpoena states "Curra will produce documents relating to sales of mattresses bearing the Named Marks by Curra's Company, Mattress Deals, to Defendant Mikey Mattress within the specified dates." *See* Ex. C. Curra's obviously incomplete production coupled with the wording of his response and objections suggests that Curra may be attempting to mask additional responsive documents through the use of "artful" phrasing. For instance, the response only refers to documents related to Defendant Mikey Mattress and excludes any reference to Defendant Mike Azzariti. Furthermore, by attempting to limit the production to only the "Named Marks" utilized by Curra, he may be attempting to

***Curra's Deposition Testimony Establishes the Existence of Additional Responsive Documents*:**

8.  **Supplier List:** Among the documents that Curra produced was a document allegedly containing certain information pertaining to the suppliers of the subject mattresses that Curra sold to Mikey's Mattress, purportedly created from memory. However, Curra's testimony as to his creation of the "Supplier List" was unclear, confusing, inconsistent, and generally unreliable. For instance, Curra initially testified that the Supplier List included the only large suppliers of mattresses that he was dealing with in 2021 and 2022. *See* Curra's February 14, 2025 Deposition, attached hereto as Exhibit "D" at p. 17:19-22. While Curra maintained that these were his suppliers for the Mikey Mattress transactions, he then testified "I don't have the dates in front of me" as to whether the Supplier List contained the suppliers that sold large amounts of mattresses through him during 2021 and 2022, which was the relevant time frame when the Mikey Mattress transactions occurred (i.e. undermining any confidence in his memory on the dates at issue and contradicting his testimony only moments before). *See id.* at p. 18:9-12. As far as any specifics pertaining to the mattresses these suppliers actually provided, Curra testified, "it's on the invoices." *See id.* at p. 18:18-21. Notably, the invoices at issue were between Mikey Mattress and Mattress Deals – and not with any supplier and contain no identifying information or details pertaining to supplier involvement.

9.  Despite his generally inconsistent and often non-responsive testimony, Curra then proceeded to testify that "he can link these suppliers to Mikey Mattress" . . . "[b]ecause I called

---

withhold information related to counterfeit and/or used mattresses (i.e. including used or altered mattresses of different brands that did not start life as genuine Tempur Sealy products). Additionally, the responsive language may seek to limit and/or ignore that Tempur Sealy's Document Request includes responsive materials pertaining to the upstream transactions between Curra and the persons and/or entities from which he acquired these products (as Curra suggests that he is a middleman/drop shipper). In sum, the convoluted language of Curra's objections to the subpoena, inappropriate efforts to limit the scope of Tempur Sealy's single request and Curra's vague and self-serving response suggest that documents may be being improperly withheld under objection and/or through this limiting responsive language.

these people at that time." *See* Ex. D at p. 19:3-4, 15-24. Curra did not provide any details on what any of the five (5) specific suppliers ("Suppliers") provided in terms of mattresses, models, delivery dates, etc. *See* e.g. *id.* at p. 20:6-21:20, 22:16-21 ("I don't remember the exact supplier that did this specific purchase order"), p. 24:19-25 ("I don't remember"), p. 25:5-8 ("I don't specifically remember at this time which were used for each specific purchase order."), p. 25:9-25 (repeatedly answering "same answer"). According to Curra, "what I remembered was this list that I gave you of suppliers was used for these purchase orders, but there are multiple purchase orders and multiple suppliers and I don't remember which was which." *See id.* at p. 26:5-11. As such, aside from their independent relevance on numerous issues, all of the documents and communications exchanged with his suppliers are necessary to determine who provided which of the mattresses at issue. Such information will, among other things, assist Tempur Sealy in further reverse engineering the supply chain for counterfeit mattresses and/or used mattresses being improperly sold as new by unauthorized sellers such as Mikey Mattress.

    10. **Mattress Inspections/Communications with Suppliers:** Curra did not personally inspect the mattresses he sold to Mikey Mattress, instead he testified that he relied upon the information he received from his suppliers. *See id.* at p. 31:19-23. Even though Curra's purchase orders/invoices to Mikey Mattress sometimes included information about the quality (i.e. 9/10 or whether there were tears/defects), Curra testified that this information was obtained from his suppliers. In other words, according to Curra, although he testified "we will look over every piece," "we" actually meant that the suppliers would do that and then relay that information to him (and he would pass it along). *See id.* at p. 35:13-18. However, Curra has failed to produce any such documents pertaining to these inspections and it strains credulity that inspections related to numerous large orders of 50-80 mattresses would have been communicated verbally and/or that

no documents were generated in connection with Curra's purchases of these items from his suppliers. By way of example, no purchase orders, invoices, credit card/bank statements (for the subject purchases), cleared checks, or other proofs of payment, bills of lading, shipping quotes, delivery documentation, or other items pertaining to these upstream transactions has been produced – just four purchase orders with Mikey Mattress (i.e. the downstream transaction) and a questionable supplier list allegedly created from his memory. *See* Ex. B. Additionally, Curra has not produced any emails related to any of these transactions with any person or entity whether upstream or downstream.

11.     **Supplements to Testimony:** Furthermore, Curra was presented with Invoice No. 400 and testified that it did not describe where that particular load was picked up from and that he could not determine that information at the time of his deposition. *See* Ex. D at p. 40:18-25. However, Curra testified that if given sufficient time he could determine where the load originated from. *See id.* at p. 41:5-7. Thus, Tempur Sealy is also seeking that Curra produce any documents which are responsive to this inquiry and if he has no responsive documents that he supplement his testimony via errata sheet with the corresponding information which he agreed that he could provide during the deposition. Curra further indicated that the same was true with respect to Invoice No. 200 and Tempur Sealy seeks the same relief with respect to it. *See id.* at p. 41:11-17.

12.     **Social Media and Dealer Purchases:** According to his sworn testimony, Curra advertised his mattress business on eBay, Facebook Marketplace, Craig's List, and made direct purchases from Mattress Firm. *See id.* at p. 42:2-25. However, no social media documents, "for sale" listings, internet advertisements/marketing (i.e. the means by which buyers would locate Curra), or any communications (such as direct/instant messages or emails) with sellers or buyers over these mediums have been produced to date.

13. **Mattress Firm Contact and Purchase Documents:** Curra testified that he did not remember whether he was working with Mattress Firm in 2021 or 2022 but nonetheless he testified that he knew that none of the mattresses sold to Mikey Mattress came from Mattress Firm, "because [he] remember[s]." *See id.* at p. 43:13-19. Curra then proceeded to testify that he had a contact at Mattress Firm but did not know which Mattress Firm location the contact had a relationship with, did not know if the contact worked at a local store or for corporate, and did not know whether the contact worked at Mattress Firm in the 2021-2022 time frame. *See id.* at p. 43:20-44:10. Again, the requested documents would provide the information that Curra could not (or would not).

14. **Text Messages and Other Communications:** During his deposition, Curra was presented screenshots of text messages between his personal cell phone and Michael Azzariti ("Azzariti") that contained a photo of mattresses that he sent to Azzariti. *See id.* at p. 49:5-50:1. These screenshots of text messages were not included within Curra's production but instead were introduced by defense counsel who apparently had independent possession of the same. Curra testified that this was a photograph taken by one of his suppliers that was sent to him (i.e. Curra did not take the photo but received it from someone else and forwarded it).

15. Therefore, it is clear that Curra has already failed to produce responsive text messages both with Azzariti and with his supplier(s) who sent him these photographs and provided the mattresses at issue for this particular order. Undoubtedly, the same can be expected to have occurred with respect to the other orders since the mattress inspections were allegedly being handled by the suppliers and then communicated to Curra, who would in turn communicate that information to his purchasers. Furthermore, the subject text message with Azzariti stated that "[l]ots are brand new in the box" which contradicts his testimony that the mattresses were clearly

used. Regardless, it is clear that there were communications, including but not limited to, text messages, photos/videos of mattresses (including dropboxes of same), telephone calls, and perhaps voicemails or other written communications that have not been produced to date in this matter. At a minimum, the text messages presented as Exhibit 6 in his deposition were improperly withheld by Curra and Tempur Sealy anticipates that additional documents have not been properly searched for and/or are being improperly withheld under objection at this time. Accordingly, Curra's objections should be overruled and he should be required to produce all such documents without further objection or delay.

16.     **Mattress Condition:** Curra was not sure and "couldn't tell you" whether he ever used the term "used" in writing to Azzariti in regard to these mattresses. *See* Ex. D. at p. 54:10-16. As Mikey Mattress advertises that it only sells brand new mattresses (despite not having the requisite status as an authorized dealer), any communications from Curra pertaining to the communicated condition of the mattresses being supplied to Mikey Mattress are highly relevant to Tempur Sealy's claims and causes of action herein.

17.     Curra did testify that he is not an "authorized seller of Tempur-Pedic mattresses." *See id.* at p. 59:3-4. He was aware that Tempur Sealy has objected to the sale of their mattresses and despite not reaching any agreement with them, Curra continues to sell Tempur Sealy mattresses today. *See id.* at p. 60:2-10. He has not changed any of his business practices as a result of Tempur Sealy's objections and apparently understands that he is not permitted to sell new Tempur Sealy mattresses or represent to others that he does – "We don't sell new Tempur-Pedic mattresses, so I don't think Tempur Sealy has a problem, from what I'm aware of, with what we're doing." *See id.* at p. 60:14-61:3. When asked if Tempur Sealy ever required him to advertise his sales solely as re-sales or sales of used mattresses – Curra testified "that's what we do." *See id.* at

p. 61:4-7. As such, many of the requested documents referenced herein will either confirm or contradict his testimony on the condition of the mattresses he was involved in moving through the supply chain.

18. **Mattress Repairs:** According to Curra, if any repairs were made to any mattresses, it was the suppliers who would make them, and they would let him know if the mattresses had been repaired. *See id.* at p. 57:22-58:2. Curra testified that if this occurred, he would let his customers know if they were receiving a repaired mattress. *See id.* at p. 58:3-5. As to whether he notified his customers if they were receiving a repaired mattress beyond what was communicated in the four invoices he produced, Curra testified that "what's in the text and in the invoices, is what's in the text and the invoices." *See id.* at p. 58:11-17. Once again, Tempur Sealy seeks any documents that exist communicating about mattress repairs or confirmation that all such documents have been produced, that a proper and exhaustive search has occurred, and nothing is being withheld under objection.

19. **Curra's Credibility**: Furthermore, in addition to his evasive testimony, Curra already admitted to being less than honest as he testified that he told Azzariti things that were untrue, such as on June 25, 2024 where he texted Azzariti and stated that his "operation has grown since we last did a deal" which Curra testified "[t]hat's not true. That was just me showboating to try to build confidence with him." *See id.* at p. 54:17-25. Other less than credible testimony was offered by Curra such as stating that "perfect, ready for sale" "can mean that the mattress is used; however, it's in perfect condition." Additionally, Curra testified dubiously that "perfect condition" means no holes, stains or rips. *See id.* at p. 52:24-53:8. Curra also testified that he would not use the term "showroom ready" with respect to new mattresses – showroom ready to him meant that the quality of the used mattress was very high, such that it could appear new. *See id.* at p. 62:7-20.

Given the issues with his testimony, Tempur Sealy is unwilling to simply take Curra's word for it on the veracity of his production while he seeks to hide behind objections and convoluted, non-responsive testimony.

***Tempur Sealy Has a Substantial Need for the Information and Documents it Seeks*:**

20.     The foregoing evidence and Curra's own admissions clearly establish that he participated in the supply chain of Tempur Sealy mattresses sold and/or delivered to Defendants. *See supra.* Moreover, there is no reasonable basis for withholding the information as the information requested is not unduly burdensome or in any way privileged and pertains to documents and information that is kept in the regular course of business and/or is easily obtainable. Additionally, the documents being sought are highly relevant to Tempur Sealy's claims against the named Defendants and the requested production does not appear to be available through other means. As such, Tempur Sealy seeks all responsive documents produced – or alternatively – confirmation that "no" documents exist with respect to each of the items referenced herein. Tempur Sealy's Production Request includes the following pertinent and responsive documents and information, along with any other items responsive to the subpoena's production request:

- All documents, phone records, contact information or other records used to aid in the creation of the "Supplier List";
- All communications, photographs, videos, drop boxes, purchase orders, invoices, or other documents that pertained to the mattress inspections described in Curra's deposition or otherwise described the condition of the mattresses being purchased by Curra from the Suppliers;
- All photographs or videos (including drop boxes) of any Tempur Sealy mattresses that were sold to Mikey Mattress through Curra;
- Documents related to Curra's Mattress Firm contact that supplied Tempur Sealy mattresses during the requested time period;
- Documents providing the agreed-to information with respect to Invoice Nos. 200 and 400 (or alternatively, a supplement to his testimony providing this information);
- Any purchase orders, invoices, receipts, sales documents, or other documents exchanged between the Suppliers and Curra during the requested time period;

- Credit card, bank statements, cleared checks, or other proofs of payment or purchase for the mattress purchases from the Suppliers;
- Any shipping quotes, packing lists, bills of lading, loading documents, delivery documents, or other written documentation pertaining to the shipment or delivery of the mattresses at issue;
- Any receipts pertaining to the sale or purchase of Tempur Sealy mattresses;
- Any e-mails, text messages, voicemails, direct messages, or other written correspondence of any kind between Curra and Mikey Mattress;
- Any e-mails, text messages, voicemails, direct messages, or other written correspondence of any kind between Curra and any Supplier(s);
- Any social media or other marketing or advertisements (i.e. eBay listings, Facebook Marketplace, Craigs List, etc.) pertaining to products offered by Curra during the relevant time period;
- Any social media or other marketing or advertisements (i.e. eBay listings, Facebook Marketplace, Craigs List, etc.) pertaining to products offered by the Suppliers during the relevant time period;
- Any social media direct or instant messages (i.e. Facebook Messenger, eBay Messages, Emails, etc.) between Curra and Mikey Mattress;
- Any social media direct or instant messages (i.e. Facebook Messenger, eBay Messages, Emails, etc.) between Curra and any of the Suppliers; and
- Any emails, receipts, listings, advertisements, purchase or sale history, account history or other documentation pertaining to Curra's purchase and/or sale of mattresses bearing Tempur Sealy marks during the requested time period.

### *No Basis to Quash Tempur Sealy's Subpoena Exists:*

21.     As noted above, Curra's objections are generic, inapplicable, and otherwise unmeritorious. Even if Curra had timely moved to quash Tempur Sealy's subpoena—a step he never took—he would find no support in Rule 45(d)(3), which sets forth the basis for quashing a subpoena. Tempur Sealy offered a reasonable time to comply and made substantial efforts to confer with Curra after it identified the aforementioned deficiencies in Curra's production. *See* Tempur Sealy's Conferral Attempts with Curra, attached hereto as Exhibit "E"; FED. R. CIV. P. 45(d)(3)(A)(i). Tempur Sealy is now seeking to enforce its subpoena within 100 miles of Dallas Texas, where Curra is located. *See* Ex. A at 1; FED. R. CIV. P. 45(d)(3)(A)(ii). The subpoena does

not request any privileged or protected matter. *See* FED. R. CIV. P. 45(d)(3)(A)(iii). Further, the subpoena does not subject Curra to any undue burden because, as noted above, all of the documents and information sought should have been kept in the ordinary course of business and/or are easily obtainable such that Curra will not be subjected to any unnecessary expense or hardship with respect to the Production Request. *See* FED. R. CIV. P. 45(d)(3)(A)(iv). Finally, as discussed in detail above, discovery to date strongly suggests that Curra is in possession of additional responsive documents for which Tempur Sealy has a substantial need.

## CONCLUSION

Wherefore premises considered, Tempur Sealy respectfully requests that the Court grant the instant motion and compel Curra to produce the information and documents responsive to the above-noted requests, overrule Curra's objections and grant any other relief to which they are entitled.

Date: July 1, 2025

**KANE RUSSELL COLEMAN LOGAN, PC**

Respectfully submitted,

By: */s/ Andrew J. Sarne*
Andrew J. Sarne, Attorney in Charge
State Bar No. 00797380
Federal I.D. 20437
ASARNE@KRCL.COM
5151 San Felipe, Suite 800
Houston, Texas 77056
Telephone: 713.425.7400
Facsimile: 713.425.7700
**ATTORNEYS FOR TEMPUR SEALY INTERNATIONAL, INC. ET AL.**

Of Counsel:

Michael Logan
State Bar No. 12497500
MLOGAN@KRCL.COM
901 Main Street, Suite 5200
Dallas, Texas 75202

Logan R. Burke
State Bar No. 24073978
Federal I.D. 1223421
LBURKE@KRCL.COM
5151 San Felipe, Suite 800
Houston, Texas 77056
Telephone: 713.425.7400
Facsimile:  713.425.7700

## CERTIFICATE OF CONFERENCE

I hereby certify that on May 15, 2025 counsel for Movants delivered a detailed conferral letter to Christopher J. Curra's last known counsel, Anthony Magee by e-mail. *See* Ex. E at 1-8. On or about May 19, 2025, Magee responded and advised Movants that he no longer represents Curra. *See id.* at 9-10. I further certify that counsel for Movants caused another conferral letter to be delivered to three (3) addresses Curra is associated with via U.S. First Class Mail and Certified Mail, Return Receipt Requested. *See id.* at 11-18. Counsel for Movant further retained a process server that attempted hand delivery of the conferral letter on Curra on at least three separate occasions at different hours of the day and according to the building concierge Curra was present at 2975 Blackburn Street, Apt. 1321, Dallas, Texas 75204 during at least two delivery attempts, but refused to accept delivery of the conferral letter. Additionally, counsel for Movant received a completed certified mail return receipt from the location where, upon information and belief, Curra is known to work. *See id.* at 20. However, Curra has not responded to Movants' multiple conferral attempts and Movants were unable to obtain Curra's official position on the Motion.

                    */s/ Andrew J. Sarne*
                    Andrew J. Sarne